STATE of Missouri, Respondent,

v.

Gary CORKINS, Appellant.

No. WD 31029.

Missouri Court of Appeals,
Western District.

Feb. 2, 1981.

Daniel L. Radke, St. Joseph, for appellant.

Michael A. Insco, St. Joseph, for respondent.

Before KENNEDY, P. J., and PRITCHARD and SWOFFORD, JJ.

KENNEDY, Presiding Judge.

Defendant was charged with felonious assault with intent to rape. He was convicted upon jury trial of common assault. He received a sentence of six months' imprisonment in the county jail.

In his appeal to this court he alleges that the court erred in six different instances in the admission of evidence. We find no error in any of the criticized rulings of the court and we affirm the judgment.

The defendant first complains of the identification of defendant by one Shirley Stewart, on the ground that her identification was based upon an overly suggestive identification procedure at police headquarters after defendant's arrest.

Shirley Stewart was at a laundromat along with her daughters Patricia and Rebecca at Tenth and Jackson Streets in St. Joseph, at approximately 8:15 o'clock p. m. on April 1, 1978, a short time before and near the place where a Mrs. Dandurant was assaulted, for which defendant was convicted. A man later identified as the defendant approached Shirley and her daughters, and tried to get them to take him to the "south end". He was staggering and his

speech was slurred, indicating to them that he was drunk. He attempted to open the doors of the Stewarts' station wagon. Shirley refused to take him to the "south end". After a spirited verbal exchange the man walked away down Tenth Street. The whole incident had taken from two to five minutes. Although it was dark the parking lot was well lighted and Shirley and the daughters could see the man plainly. Shirley said she was as close to him as the front door of her car to the back door, separated by perhaps two feet.

Attracted by female screams issuing from a house across the street, Shirley and her daughter Patricia ran to the house. The front door was halfway open and Patricia said, "We saw two figures struggling and then a woman was pushed down to the floor". The house proved to be Mrs. Dandurant's residence and the woman Mrs. Dandurant. The man, whom they recognized as the man with whom they had had the altercation at the laundromat, reached back and closed the door. They heard the key turn in the lock. Shirley and Patricia ran up to the door and started pounding on it. They called back to Rebecca, who had remained in the laundromat parking lot, to call the police.

Mrs. Dandurant's assailant apparently fled through the back of the house, for he did not come out the front door. When Mrs. Dandurant got the door open, she was in a disheveled and shaken condition. Shirley and Patricia took her to the laundromat with them. The police arrived shortly. Shirley took Mrs. Dandurant to a hospital for examination, staying with her until her daughter arrived.

Upon the instructions of a police officer, Shirley then went to the police station for the purpose of giving a statement. While there, going through the police station from one section to another, she passed a room where the door was open. In the room were four men, one a uniformed police officer, two men in street clothes who proved to be policemen, and the defendant. Shirley recognized him at once as the person she had seen at the laundromat and had seen struggling with Mrs. Dandurant. At this time it had reached 9:30 o'clock, approximately an hour and fifteen minutes since her encounter with him at the laundromat, followed a couple of minutes later by the incident at Mrs. Dandurant's house.

■ In the circumstances of this case, the trial court was entirely correct in denying defendant's motion to suppress the pre-trial police station identification of the defendant by Shirley, and was also correct in allowing her to identify the defendant in the courtroom. When there is taken into account the full and ample opportunity which Shirley had to observe the defendant at the laundromat, in a well-lighted area, at close range, over a space of from two to five minutes; sees him again momentarily as he struggled with Mrs. Dandurant; and then sees him and identifies him in as short a time as an hour and fifteen minutes later, there is no chance that her identification could be tainted by this identification procedure. *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *State v. Ralls*, 583 S.W.2d 289, 291 (Mo.App.1979); *State v. Simmons*, 559 S.W.2d 557, 561 (Mo.App. 1977); *State v. French*, 528 S.W.2d 170, 172–3 (Mo.App.1975). Although Shirley had been informed that the police had a suspect in custody, she did not know that he was at the police station where she went to give her statement. She was not expecting to see the suspect there. When she saw the defendant, there was nothing to indicate that he was under arrest. There was a uniformed policeman in the room but he had his back turned and was looking out the window. The defendant was sitting in the room without handcuffs. The other two men were in ordinary street clothes, and were not known to Shirley to be policemen.

■ Appellant next complains of the court's rejection of evidence that the defendant had been in the military service and had had combat training and combat experience in Vietnam. Defendant claims this evidence would have tended to show that defendant was not the person who

attacked Mrs. Dandurant. He points to Mrs. Dandurant's testimony that she put up a battle. She testified that he knocked her to the floor with his fist. She got up. He pushed her down "five times in all, but on one of those scuffles, I don't know how I did it, I got on the front porch. He was still hanging onto me." He dragged her back in, pushed her on the floor, then shut her door and locked it with her key. Defendant reasons that a person who had had combat training and combat experience in Vietnam would not have had such difficulty in subduing an "elderly" 57-year-old woman such as Mrs. Dandurant.

Defendant's military service and his combat training and experience in Vietnam, at some undisclosed time in the past, was too remote, both in time and logical connection, to require its admission into evidence. The court did not err in excluding it. *State v. Feger,* 340 S.W.2d 716, 725–726 (Mo.1960); *State v. Rose,* 249 S.W.2d 324, 333 (Mo. banc 1952); *State v. Joiner,* 559 S.W.2d 226 (Mo. App.1977).

Defendant complains that the court excluded evidence that he had been in military service. That testimony, however, was not excluded. It was admitted, and there is no ground for defendant's complaint.

◼ Defendant next says that the court erred in permitting the prosecuting attorney to cross-examine the defendant's wife, Adelina Corkins, about his propensity to drink alcoholic beverages and to become drunk or tipsy on festive occasions.

Defendant did not object to this cross-examination at the time, but says that we should review it as plain error under Supreme Court Rule 29.12(b). Apparently the defendant's position is that the court should have intervened *sua sponte.*

According to defendant's argument, the impropriety of the cross-examination lay in its proof of defendant's bad character, as evidenced by his drinking habits, when the defendant had not opened up the subject by evidence of his own good character. It was entirely proper for the state to draw out this evidence of defendant's drinking pro-

clivities on another issue than defendant's character. *State v. Lorts,* 269 S.W.2d 88, 91–92 (Mo.1954), and authorities cited therein. There was evidence that Mrs. Dandurant's assailant was intoxicated. Adelina said that defendant had left their house at about 4 o'clock in the afternoon. He was going to St. Patrick's Church for the pitch tournament. Defendant and Adelina were to be at a cookout at the Goodwin home at 7 o'clock that evening. He never showed up. At 8:20 o'clock she called him at St. Patrick's Church. She said that he said the card game was not over and he would be home whenever it was over. She said, "He didn't sound drunk, but he sounded like any ordinary person would if he was drinking". To show by cross-examination of Adelina that defendant was in the practice of getting drunk or tipsy on social occasions, and to show that he was drinking on this evening, was entirely proper cross-examination. It had some tendency to support the identification of defendant as the culprit. It was not error, plain or otherwise.

◼ Defendant claims that the court abused his discretion by admitting testimony of Detective Brooke as to his presence and observations at the scene of the crime on April 1, 1978, because the fact of this witness's having visited the scene of the crime had not been disclosed to defendant pursuant to his request for discovery.

Defendant filed the following request for discovery:

"The names and last known addresses of persons whom the State intends to call as witnesses at any hearing or at trial, together with their written or recorded statements, and existing memoranda reporting or summarizing part or all of their oral statements."

In reviewing Detective Brooke's testimony, along with objections made thereto, and the side-bar exchange among state and defense counsel and the court, there is no showing at all that this request for discovery was not fully complied with by the state. The request did not require the state specifically to disclose to defendant that

Detective Brooke had been at the scene of the crime, except as that may have been disclosed in "written or recorded statements, or in existing memoranda reporting or summarizing part or all of their oral statements". The state evidently had only one report of the police investigation, a copy of which had been furnished to defendant. Detective Brooke's name was endorsed on the information as a witness the state intended to call. The defendant had even taken Detective Brooke's deposition. Defendant has nothing to stand on with this point.

■ Defendant claims the court erred in allowing certain testimony of Mrs. Dandurant on redirect examination. The prosecutor in direct examination had questioned Mrs. Dandurant about her having identified defendant in certain pictures showed to her by the police. He dropped that line of questioning and defense counsel did not refer to it in his cross-examination. The prosecutor then on redirect, over defendant's objection, returned to the subject of the photographs. Mrs. Dandurant was able to identify five of eleven photographs shown to her, but not the other six. (All eleven photographs were later identified by a police officer and were admitted into evidence.)

Defendant cites us to the general rule that redirect examination should not go beyond the testimony elicited during cross-examination. He acknowledges, however, that that rule yields to the rule that the trial court in his discretion may allow the redirect examination to exceed the scope of cross-examination. *Johnson v. Minihan*, 355 Mo. 1208, 200 S.W.2d 334, 336–337 (1947). We see no prejudice to the defendant in the court's having permitted the state to identify the photographs by Mrs. Dandurant's testimony on redirect examination. The trial court was well within his discretion in permitting it.

The prosecuting attorney has not furnished this court a respondent's brief, as he is required by § 56.060, RSMo 1978, to do. In failing to perform this duty he has placed an unnecessary burden upon the court.

The judgment is affirmed.

All concur.